Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: dsharp@girardsharp.com
Email: apolk@girardsharp.com

*Counsel for Plaintiffs*

[additional counsel on signature block]

# UNITED STATES DISTRICT COURT
## DISTRICT OF CALIFORNIA
## SAN FRANCISCO DISTRICT

|  |  |
|---|---|
| YOGENDRA YADAV, JUAN ELIAS, SAROJ PANIGRAHY, RANDI WELCH BURG, and LYNNE GROGG, and NICHOLAS ZURAWSKYJ, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs<br><br>    vs.<br><br>SALESFORCE, INC., FARMERS INSURANCE EXCHANGE, FARMERS GROUP, INC., FARMERS NEW WORLD LIFE INSURANCE CO., TRANSUNION LLC., WORKDAY, INC., PANDORA JEWELRY, LLC, and PANDORA JEWELRY, A/S,<br><br>        Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Yogendra Yadav, Juan Elias, Saroj Panigrahy, Randi Welch Burg ("Burg"), Lynne Grogg, and Nicholas Zurawskyj ("Plaintiffs") bring this Class Action Complaint, individually and on behalf of all others similarly situated ("Class Members") against Salesforce, Inc., ("Salesforce"), Farmers Insurance Exchange, Farmers Group, Inc., Farmers New World Life Insurance Co. (collectively, "Farmers"), TransUnion LLC ("TransUnion"), Workday, Inc. ("Workday"), Pandora Jewelry, LLC and Pandora A/S, Inc. (together, "Pandora"; collectively with all other Defendants, "Defendants"), and allege as follows, based upon information and belief, the investigation of counsel, and the personal knowledge of Plaintiffs.

## NATURE OF THE CASE

1.    This "hub-and-spoke" data breach involves the unauthorized access and exfiltration of sensitive Personal Identifiable Information (PII), including names, addresses, dates of birth, driver's license numbers, and/or partial Social Security numbers, of millions of Class Members, including Plaintiffs.[1]

2.    The "hub" in this breach is Salesforce, a company specializing in cloud-based data storage software and technology serving thousands of corporate clients by facilitating sales, customer service, marketing automation, e-commerce, and analytics with Class Members. During the ordinary course of its business, Salesforce stores an enormous amount of its customers' PII and generated nearly $38 billion in revenue last fiscal year. Each of the cyber incursions described below occurred because Salesforce's Data Loader portal, used by spoke Defendants to import or export Salesforce data, is easily mimicked by bad actors.[2]

3.    Salesforce touts that it "***follow[s] the Shared Responsibility Model and believe[s] security is a shared responsibility between Salesforce and its customers***."[3]

4.    Defendant Farmers is one spoke with whom Salesforce shares responsibility for data protection. Farmers—one of the nation's largest insurance companies providing, *inter alia*, automobile,

---

[1]  This figure does not include the over 70 million potentially affected individuals served by Defendant Workday.

[2] *See* https://developer.salesforce.com/tools/data-loader (last visited Sept. 8, 2025).

[3] *See* https://www.salesforce.com/blog/shared-responsibility-model/ (last visited Sept. 8, 2025).

CLASS ACTION COMPLAINT
Case No.

property, life, and commercial insurance—generated over $27 billion in gross written premiums in fiscal year 2023.

5. Another spoke is Defendant TransUnion. TransUnion is one of three major credit bureaus, storing the PII of hundreds of millions of Americans and generating over $4 billion in annual revenue.

6. Defendant Workday is another spoke, which provides a cloud-based Enterprise Resource Planning (ERP) platform to help businesses manage human resources (HR) and financial management tasks such as payroll. It generated over $8 billion in revenue last fiscal year.

7. Defendant Pandora is another spoke. Pandora, an online and brick-and-mortar jewelry retail store, generated over $1.3 billion in revenue in 2024 from United States customers alone.

8. Farmers, TransUnion, Workday and Pandora are all Salesforce customers that used its services and software, and in doing so, entrusted Salesforce with the PII of their customers and employees. In turn, Farmers, TransUnion, Workday, and Pandora's customers entrusted them with their PII.

9. The data breaches at issue were highly preventable and perpetrated using techniques and vulnerabilities known to Defendants well in advance.

10. Specifically, fully aware of the threats and vulnerabilities to Defendants' systems and the imminent threat of attacks on those systems, on March 12, 2025, Salesforce published a blog for its customers titled "Protect Your Salesforce Environment from Social Engineering Threats."[4] Salesforce identified the specific type of voice phishing ("vishing") attack that would soon be used against each spoke Defendant and outlined five "proactive measures" spoke Defendants should, and ultimately did not, take to strengthen their data security and access controls.[5]

11. Two months later, on May 30, 2025, Salesforce notified Farmers of "suspicious activity involving an unauthorized actor accessing one of [Salesforce's] databases containing Farmers customer information" (the "Farmers Data Breach").[6] According to Farmers, its forensic investigation revealed an

---

[4] *See* https://www.salesforce.com/blog/protect-against-social-engineering/ (last visited Sept. 8, 2025).
[5] *Id.*
[6] Farmers Notice of Security Incident, Farmers, https://www.farmers.com/content/dam/farmers/marketing/digital/aem/pdfs/disclosures/notice-ofincident.pdf (last visited Sept. 3, 2025).

CLASS ACTION COMPLAINT
Case No.

unauthorized cyber-attack occurred on May 29, 2025 and involved the exfiltration of the "name, address, date of birth, driver's license number, and/or last four digits of Social Security number" of Class Members.[7]

12.     Just six days later, Google's Threat Intelligence Group ("GTIG") echoed Salesforce's own warnings when it reported that the cybercriminal organization UNC6240, a.k.a. ShinyHunters, was using a common and well-known social-engineering vishing technique to gain unauthorized access to Defendants' systems and databases because Defendants failed to implement fundamental and basic security measures that could have prevented the Data Breaches.[8] GTIG explained that ShinyHunters was "*a financially motivated threat cluster that specializes in voice phishing (vishing) campaigns specifically designed to compromise organizations' Salesforce instances for large-scale data theft and subsequent extortion*."[9] GTIG highlighted that "it's essential for [Defendants] to configure and manage access, permissions, and user training according to best practices" to prevent such data security incidents.[10]

13.     On July 30, 2025, Salesforce notified TransUnion of an unauthorized cyber-attack involving Salesforce's databases containing TransUnion customer information (the "TransUnion Data Breach").[11] According to TransUnion, its forensic investigation revealed the unauthorized cyber incursion occurred on July 28, 2025.[12]

14.     On or about August 5, 2025, Pandora confirmed it "experienced a cyber security attack, where some customer information was accessed through [Salesforce] . . . ." (the "Pandora Data

---

[7] *Id.*

[8] *See* https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion (last visited Sept. 3, 2025).

[9] *Id.* (emphasis added).

[10] *Id.*

[11] TransUnion Data Breach Notice to Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html?7194ef805fa2d04b0f7e8c9521f97343 (last visited Sept. 3, 2025).

[12] *Id.*

CLASS ACTION COMPLAINT
Case No.

Breach").[13] According to Pandora, its forensic investigation revealed the unauthorized cyber-attack involved "names and email addresses."[14]

15.     On August 15, 2025, Workday confirmed it "had been targeted and threat actors were able to access some information from [Salesforce]" via a "recent social engineering campaign" (the "Workday Data Breach").[15] According to Workday, its forensic investigation revealed the unauthorized cyber-attack involved "names, email addresses, and phone numbers."[16]

16.     Despite warning that these attacks were imminent and promising customers that, "[a]s part of our Shared Responsibility Model, *we are committed to helping customers secure their Salesforce instances*,"[17] Salesforce did nothing to fortify its networks to prevent these attacks (collectively the Farmers Data Breach, TransUnion Data Breach, Pandora Breach, and Workday Data Breach are referred to as the "Data Breaches") or otherwise aid spoke Defendants in preparing and defending against the Data Breaches beyond publishing a blog article.

17.     In addition to the Data Breaches, several other Salesforce customers have been breached by the same threat actors using the same foreseeable and preventable Salesforce vulnerability and Plaintiffs reserve the right to amend their complaint to add additional spoke defendants.[18]

18.     In the aftermath of the attacks, Salesforce referred its customers, including spoke Defendants, to its blog post concerning social engineering security risks and offered only that "[a] social engineering and phishing threats continue to rise, our top priority is to help customers strengthen their security posture."[19]

---

[13] *See* https://www.forbes.com/sites/daveywinder/2025/08/05/pandora-confirms-cyberattackwhat-you-need-to-know/ (last visited Sept. 3, 2025).

[14] *Id.*

[15] Blog, "Protecting You From Social Engineering Campaigns: An Update From Workday," available at https://blog.workday.com/en-us/protecting-you-from-social-engineering-campaigns-update-from-workday.html (last visited Sept. 3, 2025).

[16] *Id.*

[17] *See* https://www.salesforce.com/blog/shared-responsibility-model/ (last visited Sept. 8, 2025).

[18] Ionut Arghire, *Hundreds of Salesforce Customers Hit by Widespread Data Theft Campaign*, SecurityWeek, Aug. 27, 2025, available at https://www.securityweek.com/hundreds-of-salesforce-customers-hit-by-widespread-data-theft-campaign/.

[19] *See* https://status.salesforce.com/generalmessages/10001549 (last visited Sept. 8, 2025).

CLASS ACTION COMPLAINT
Case No.

19.     Plaintiffs and Class Members have been substantially injured by Defendants' data security failures. Plaintiffs further believe that their and Class Members' PII has or will be published for sale on the dark web following the Data Breaches, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

20.     As a result of the Data Breaches, Plaintiffs have suffered numerous injuries, including invasion of privacy, lost time and expenses mitigating the risk of data misuse, diminishment in value of their PII, and failing to receive the benefit of the bargain reached with Defendants.

21.     Plaintiffs bring this action to hold Defendants accountable for their data security failures, enjoin their continued failure to implement basic and fundamental data security practices, and recover damages and all other relief available at law on behalf of themselves and members of the classes they seek to represent.

## PARTIES

### A.     Defendants

22.     Salesforce is a privately held cloud-based software company with its headquarters and principal place of business at 415 Mission Street, San Francisco, San Francisco County, California 94105. Salesforce is a for-profit company organized and incorporated under the laws of the State of Delaware.

23.     Salesforce is a citizen of both California and Delaware.

24.     Farmers Insurance Exchange is an unincorporated association, with its headquarters and principal place of business at 6301 Owensmouth Avenue, Woodland Hills, Los Angeles County, California 91367.

25.     Farmers Group, Inc. is an insurance management and holding company with its headquarters and principal place of business at 6301 Owensmouth Avenue, Woodland Hills, Los Angeles County, California 91367. Farmers Group, Inc. is organized and incorporated under the laws of the State of Nevada. Farmers Group, Inc. is the parent company of Farmers New World Life Insurance Company.

26.     Farmers is a citizen of both California and Nevada.

27.     Farmers New World Life Insurance Company has its headquarters and principal place of business at 3120 139th Avenue SE, Bellevue, King County, Washington 98005. Farmers New World Life Insurance Company is organized and incorporated under the laws of the State of Washington.

CLASS ACTION COMPLAINT
Case No.

1   Farmers New World Life Insurance Company is a subsidiary of Farmers Group, Inc. and operates the life

2   insurance aspect of Farmers Group, Inc.

3         28.    TransUnion, LLC operates as an international information and insights company with its

4   headquarters and principal place of business at 555 West Adams Street, Chicago, Cook County, Illinois

5   60661. TransUnion, LLC is organized and incorporated under the laws of the State of Delaware.

6         29.    TransUnion is a citizen of Illinois and Delaware.

7         30.    Workday, Inc. is an HR and Financial Management enterprise cloud-based applications

8   company with its headquarters and principal place of business at 6110 Stoneridge Mall Road, Pleasanton,

9   Alameda County, California 94588. Workday, Inc. is organized and incorporated under the laws of the

10  State of Delaware.

11        31.    Workday is a citizen of California and Delaware.

12        32.    Pandora Jewelry, LLC is a jewelry design and manufacturing company that is a subsidiary

13  of Pandora Jewelry, A/S with its North American headquarters and principal place of business at 1540

14  Broadway, New York, New York County, New York 10036. Pandora Jewelry, LLC is organized and

15  incorporated under the laws of the State of Maryland.

16        33.    Pandora Jewelry, LLC is a citizen of New York and Maryland.

17        34.    Pandora Jewelry, A/S is a jewelry design and manufacturing company and the parent

18  company of Defendant Pandora Jewelry, LLC that is headquartered and incorporated in Copenhagen,

19  Denmark.

20        35.    Together, Farmers, Transunion, Workday, and Pandora are referred to as the Spoke

21  Defendants.

22  **B.    Plaintiffs**

23        36.    Yogendra Yadav is a resident of Monmouth County, New Jersey and is insured by

24  Farmers.

25        37.    Plaintiff Juan Elias is a resident of Fort Bend County, Texas and a former employee of

26  Workday.

27        38.    Plaintiff Saroj Panigrahy is a resident of Alameda County, California and a former

28  employee of Workday.

CLASS ACTION COMPLAINT
Case No.

39.    Plaintiff Randi Burg is a resident of Cook County, Illinois and current TransUnion customer.

40.    Plaintiff Nicholas Zurawskyj is a resident of Lee County, Florida and current TransUnion customer.

41.    Plaintiff Lynne Grogg is a resident of Montgomery County, Maryland who has purchased goods from Pandora brick-and-mortar locations in Maryland and Florida, as well as online in Maryland.

## JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members, including Plaintiff Yadav, are citizens of a different state than any Defendant.

43.    This Court has personal jurisdiction over Salesforce because Salesforce maintains its headquarters and principal places of business in this District. Salesforce also conducts substantial business in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

44.    This Court has personal jurisdiction over Farmers Insurance Exchange and Farmers Group, Inc., because they maintain their headquarters and principal places of business in California. They also conduct substantial business in this District, including the operations of insurance agents at over 20 brick and mortar locations within the District, engage in the conduct at issue in California, and/or otherwise have substantial contacts with this District and purposely avail themselves of the Courts in this District.

45.    This Court has personal jurisdiction over Farmers New World Life Insurance Company because its parent company, Farmers Group, Inc., maintains its headquarters and principal place of business in California. Farmers New World Life Insurance Company also conducts substantial business in this District, including the operations of life insurance agents at over 20 brick and mortar locations within the District, engages in the conduct at issue in California, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

CLASS ACTION COMPLAINT
Case No.

46.     This Court has personal jurisdiction over TransUnion because TransUnion conducts substantial business in this District, including marketing to customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

47.     This Court has personal jurisdiction over Workday because Workday maintains its headquarters and principal places of business in this District. Workday also conducts substantial business in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

48.     This Court has personal jurisdiction over Pandora because Pandora conducts substantial business in this District, including operating three brick and mortar locations in San Francisco, marketing to customers in this District and accepting and processing payments in this District, engages in the conduct at issue in this District, and/or otherwise has substantial contacts with this District and purposely avails itself of the Courts in this District.

49.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(1)–(2), 1391(b)(2), and 1391(c)(2) as hub Defendant Salesforce's principal place of business is in this District, along with spoke Workday, and a substantial part of the events giving rise to the claims emanate from activities within this District.

## DIVISIONAL ASSIGNMENT

50.     Assignment to the San Francisco Division of this Court is proper because Salesforce's principal place of business is in San Francisco, California.

## FACTUAL ALLEGATIONS

### I.     SALESFORCE'S BUSINESS

51.     Salesforce was founded in San Francisco in 1999 with a goal of making customer relation management ("CRM") tools accessible to businesses by "deliver[ing] software over the internet (what we now call the cloud) instead of traditional on-premise installations."[20]

---

[20] *See* https://www.linkedin.com/pulse/evolution-salesforce-timeline-from-1999-2024-oaktreesoft-fhmkc#:~:text=Salesforce%20was%20founded%20in%201999,of%20traditional%20on%2Dpremise%20installations (last visited Sept. 4, 2025).

CLASS ACTION COMPLAINT
Case No.

52.      Today, Salesforce touts itself as "the #1 AI CRM, where humans with agents drive customer success together with AI, data, and Customer 360 apps on one platform."21 Salesforce's business model is made possible by the "Data Cloud, which brings together all your data into unified profiles, while keeping it secure."22 Salesforce's CRM tools bring "teams together around a single shared view of each customer's data, accessible to every employee . . . ."23

53.      Salesforce explains that it "works by unifying all of your customer data on one platform to provide a single shared view of your customer, accessible to any member of any department at any time."24

54.      Salesforce's customers, including Farmers, Transunion, Workday and Pandora, store the PII of their customers and/or employees on Salesforce's platform through the use of Salesforce's Data Loader among other offered services and software.

55.      Salesforce's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Salesforce markets and highlights the strength of its data security practices to entice customers to use Salesforce's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

     a.      Salesforce acknowledges that "data is the fuel of modern business . . . ."25

     b.      Salesforce recognizes that "***Security, privacy, and compliance are critical to every business**. To provide customers with the most secure solutions possible, **Salesforce builds security into everything we do***.26

---

21 *See* https://www.salesforce.com/blog/what-does-salesforce-do/#:~:text=Products-,Products,Partner%20Apps%20&%20Experts (last visited Sept. 4, 2025).

22 *Id.* (emphasis added).

23  *Id.* (emphasis added).

24 *Id.* (emphasis added).

25 *Id.*

26 *See* https://www.salesforce.com/blog/shared-responsibility-model/ (emphases added) (last visited Sept. 8, 2025).

CLASS ACTION COMPLAINT
Case No.

c.    Salesforce claims that its "***Data Cloud keeps your data secure*** with zero copy integration, pulling everything into unified profiles without copying or moving it."[27]

d.    Salesforce advertises that its Shield 2.0 product will safeguard customers' "most important asset: critical and sensitive data" by "[p]roactively defend[ing] against internal and external threats . . . ."[28] Salesforce further claims that Shield 2.0 provides "comprehensive security for critical data in Salesforce" and allows customers to "get a real-time pulse on who has access to what data, when."[29]

e.    Salesforce advertises that its masking and seeding products will help customers comply with privacy laws by "***minimizing the risk of data leaks, breaches,*** and noncompliance fines."[30]

•    Salesforce advertises that its privacy center products will help customers comply with the General Data Protection Regulation by "de-identify[ing] sensitive data in production [and] delet[ing] excess data . . . ."[31]

•    Salesforce advertises that its Security Center 2.0 product will "[q]uickly identify misconfigurations and incorrect user permissions, eliminating any gaps in your org's security posture."[32]

•    Salesforce advertises that its Salesforce Mobile App Plus product "ensures robust security protocols, providing peace of mind."[33]

•    Salesforce's Privacy Policy represents "[t]rust is our #1 value. ***Salesforce's top priority is the security and privacy of the data that we are entrusted to protect***."[34]

•    Salesforce's Privacy Policy also represents that "our cloud services are ***designed to help customers comply with privacy laws*** around the world."[35]

---

[27] *See* https://www.salesforce.com/blog/what-does-salesforce-do/#:~:text=Products-,Products,Partner%20Apps%20&%20Experts (last visited Sept. 4, 2025) (emphasis added).

[28] *See* https://www.salesforce.com/platform/shield/ (last visited Sept. 4, 2025).

[29] *Id.*

[30] *See* https://www.salesforce.com/platform/data-masking/ (last visited Sept. 4, 2025) (emphasis added).

[31] *See* https://www.salesforce.com/platform/privacy-center/ (last visited Sept. 4, 2025).

[32] *See* https://www.salesforce.com/platform/security-center/ (last visited Sept. 4, 2025).

[33] *See* https://www.salesforce.com/platform/mobile-app-builder/ (last visited Sept. 4, 2025).

[34] *See* https://www.salesforce.com/company/legal/privacy/ (emphasis added) (last visited Sept. 4, 2025).

[35] *Id.* (emphasis added).

CLASS ACTION COMPLAINT
Case No.

- Salesforce's Privacy Policy also represents that "[*w*]*e take appropriate precautions* including organizational, technical, and physical measures *to help safeguard against* accidental or unlawful destruction, loss, alteration, and *unauthorized disclosure of, or access to, the Personal Data we process or use*."[36]

- Salesforce claims that "[*w*]*e protect your data at all times*, using strong security measures that are regularly verified by internal safeguards and external auditors."[37]

f.   In its support for a comprehensive federal data privacy law to protect U.S. consumers in 2022, Salesforce "*recognize[d] privacy as a fundamental human right and business imperative*."[38]

56.   During the ordinary course of its business (primarily through the operation of its cloud-based databases), Salesforce receives the PII of individuals, including Plaintiffs and Class Members, from its customers Farmers, Workday, TransUnion, and Pandora. With respect to the protection of this data Salesforce acknowledges that **"*Cybersecurity is a shared responsibility between a provider and their customers. While Salesforce builds enterprise-grade security into every part of our platform, customers play a vital role in protecting their data — especially amid a recent rise in sophisticated social engineering and phishing attacks targeting Salesforce customers*."[39]**

57.   Because cloud-based databases and software applications like those developed and used by Salesforce and its customers are prime targets for cybercriminals due to the volume of data they house and transfer, Defendants knew or should have known of the risks of a potential data breach. One recent report has highlighted the risks presented specifically by cloud storage as follows:[40]

It is estimated that more than 60% of the world's corporate data is stored in the cloud. *That makes the cloud a very attractive target for hackers. In 2023, over 80% of data breaches involved data stored in the cloud.* That is not just because the cloud is an attractive target. In many cases, *it is also an*

---

[36] *Id.* (emphasis added).

[37] *See* https://www.salesforce.com/privacy/overview/ (emphasis added) (last visited Sept. 4, 2025).

[38] *See https*://www.salesforce.com/news/stories/salesforce-renews-call-for-us-privacy-law/#:~:text=To%20protect%20people%2C%20promote%20trust,that%20interoperates%20with%20global%20standards (last visited Sept. 4, 2025).

[39] *See* https://www.salesforce.com/blog/protect-against-social-engineering/ (last visited Sept. 8, 2025).

[40] https://hbr.org/2024/02/why-data-breaches-spiked-in-2023 (emphasis added) (last visited Sept. 4, 2025) (emphases added).

CLASS ACTION COMPLAINT
Case No.

*easy target due to cloud misconfiguration* – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups.

## II.    FARMERS' BUSINESSES

58.    Farmers, founded in 1928, has over 20,000 employees, making it one of the nation's largest insurance companies.,[41] Farmers serves clients across the country and offers a wide range of insurance and financial-services products.[42]

59.    Like Salesforce, Farmers is well aware of the necessity of data security to its customers and employees. Farmers' Privacy Statement highlights the importance of data security to its customers and employees, including stating that **"[w]e are committed to properly safeguarding consumer personal information** and only using data in a manner that is necessary for servicing or better understanding our customers and potential customers. *Our policy is to protect the confidentiality of the personally identifiable information that you provide, and to limit access to that information only to those with a need to know.*"[43]

60.    Farmers' Privacy Statement further provides that **"[o]ur policy is to restrict access to nonpublic personal information about you** only to those employees who need to know that information to provide products or services to you, or to provide necessary technical support. *We require the employees with access to your nonpublic personal information, including your social security number, to use safeguards against unauthorized access, use, and unlawful disclosure.*"[44]

61.    Farmers receives the PII of individuals, from its employees and the entities and individuals that use its services. Farmers then entrusts this PII to its third-party vendors and service providers like Salesforce.

62.    Farmers is a Salesforce customer. Farmers stores its employees' and customers' PII on Salesforce's cloud-based software, network, and/or products.

---

[41] *See* https://www.farmers.com/about-us/ (last visited Sept. 4, 2025).

[42] *Id.*

[43] *See* https://www.farmers.com/privacy-statement/ (emphasis added) (last visited Sept. 4, 2025) (emphases added).

[44] *Id.* (emphasis added).

CLASS ACTION COMPLAINT
Case No.

## III.    WORKDAY'S BUSINESS

63.    Workday, was founded over twenty years ago and has over 11,000 business customers and over 20,000 employees. It serves clients in a broad array of industries across the country.[45] Workday claims to have "boldly led HR and finance to the cloud" and now claims to be "leading the way in the age of agentic AI."[46]

64.    Workday is also well aware of the necessity of data security to its customers and employees. On its Workday Security page, Workday highlights the importance of data security to its customers and employees, including stating that **"*[we]'re committed to protecting your data* and communicating transparently. *We employ rigorous measures across our people, processes, and technology to safeguard your data*, applications, and infrastructure."[47]**

65.    The Workday Security page further claims that **"*[l]eadership prioritizes security at every level of our organization.* All Workmates are responsible for the protection of our customers' data and receive security, privacy, and compliance training. Our dedicated Information Security team provides ongoing training to minimize risk, *while Workday Security Champions advocate for security best practices.*"[48]**

66.    In a 2022 blog post, Workday's Chief Trust Officer claimed that "[s]afeguarding our customers' data is a top priority at Workday."[49] He further acknowledged that "*[w]e know safeguarding our customers' most precious assets—people and financial data—is a tremendous responsibility. That's why we infuse security into everything we do.*"[50]

67.    In its Privacy Statement, Workday states tha**t "*[a]t Workday, we believe privacy is a fundamental right*,** regardless of where you live. When you connect with Workday, *we understand you*

---

[45] *See* https://www.workday.com/en-us/company/about-workday/our-story.html (last visited Sept. 4, 2025).

[46] *Id.*

[47] *See* https://www.workday.com/en-us/why-workday/trust/security.html (emphasis added) (last visited Sept. 4, 2025).

[48] *Id.* (emphasis added).

[49] *See* https://blog.workday.com/en-us/how-infuse-security-everything.html (last visited Sept. 4, 2025).

[50] *Id.* (emphasis added).

CLASS ACTION COMPLAINT
Case No.

*are trusting us to handle your personal information appropriately.***[51]** Workday also provides a "Data Privacy Framework" that includes "adhere[nce] to the principles of the EU-U.S. Data Privacy Framework (EU-U.S. DPF), the UK extension to the EU-U.S. DPF, and the Swiss-U.S. Data Privacy Framework (Swiss-U.S. DPF) as set forth by the U.S. Department of Commerce."[52]

68.    Workday receives the PII of individuals from its employees and the entities and individuals that use its services. In turn, Workday entrusts this PII to its third-party vendors and service providers like Salesforce.

69.    Workday is a Salesforce customer. Workday stores its employees' and customers' PII on Salesforce's cloud-based software, network, and/or products.

## IV.    TRANSUNION'S BUSINESS

70.    TransUnion was founded over fifty years ago and purports to be "committed to ensuring every individual is reliably represented in global commerce so consumers and organizations can transact with confidence . . . ."[53] In addition to being a credit-reporting agency, TransUnion has "expand[ed] into new areas like fraud, marketing and customer-driven analytics."[54]

71.    TransUnion is well aware of the necessity of data security to its customers and employees. It highlights that it regularly deals in consumer "public and proprietary information," which it claims to "steward[] with care."[55] TransUnion's Data Security page claims that "*[t]he security and protection of consumer information is the highest priority for TransUnion.*"[56] TransUnion further claims that "*[d]ata security and stewardship is vital to consumer protection and enabling trust.* At TransUnion, we continually invest in improvements to protect the data we hold on behalf of consumers and businesses."[57]

---

[51] *See* https://www.workday.com/en-us/privacy.html (last visited Sept. 4, 2025) (emphasis added).

[52] *See* https://www.workday.com/en-us/privacy.html#privacy-tabs (last visited Sept. 4, 2025).

[53] *See* https://www.transunion.com/about-us (last visited Sept. 4, 2025).

[54] *Id.*

[55] *Id.*

[56] *See* https://www.transunion.com/client-support/data-security (emphasis added) (last visited Sept. 4, 2025).

[57] *Id.* (emphasis added).

CLASS ACTION COMPLAINT
Case No.

TransUnion also claims that "[o]ur highly-skilled talent deploys industry-leading solutions to manage the vulnerability and threat environment . . . ."[58]

72.     Regarding third-party vendors and partners such as Salesforce, TransUnion claims that "*suppliers and vendors . . . are carefully selected* **to support our risk goals.** ***Our Third-Party Risk Management program sets requirements and guidelines for third-party vendors***, *suppliers and partners*, using an Enterprise Security Ratings Platform to gather terabytes of data from security sensors around the world, and providing insights concerning potential risks."[59]

73.     TransUnion claims to be "***committed to aligning with industry-leading, cyber risk management best practices, and complying with all legal and regulatory requirements.*** Our information security program is fundamentally based on ISO\IEC 27001:2013. . . . Additionally, TransUnion maintains several information security certifications annually, including Payment Card Industry (PCI), SSAE 18 SOC II Type II and ISO 27001."[60]

74.     Approximately one week after the TransUnion Data Breach, TransUnion modified its Privacy Notice.[61]

75.     TransUnion receives the PII of individuals from its employees and the entities and individuals that use its services. In turn, TransUnion entrusts this PII to its third-party vendors and service providers like Salesforce.

76.     TransUnion is a Salesforce customer. TransUnion stores its employees' and customers' PII on Salesforce's cloud-based software, network, and/or products.

## V.     PANDORA'S BUSINESS

77.     Pandora employs over 33,000 people and touts its "exceptional journey from a local [D]anish jeweler's shop to a world-leading, global jewellery company present in more than 100 countries."[62] Pandora entered the U.S. market, "today the company's largest market," in 2003.[63] "Pandora

---

[58] *Id.*

[59] *Id.* (emphasis added).

[60] *Id.* (emphasis added).

[61] *See* https://www.transunion.com/privacy/transunion (last visited Sept. 4, 2025).

[62] *See* https://pandoragroup.com/about/pandora-in-brief/the-pandora-story (last visited Sept. 4, 2025).

[63] *Id.*

CLASS ACTION COMPLAINT
Case No.

operates and manages a vertically integrated business model from in-house design and production to *global marketing and direct distribution in most markets.* Pandora's products are available in more than 100 countries on six continents through more than 6,700 points of sale, *including around 2,600 concept stores.*"[64]

78.     Pandora is well aware of the necessity of data security to its customers and employees. On its Data Security page, Pandora highlights the importance of data security to its customers and employees, including stating that **"[a]t Pandora, we respect your privacy and thank you for trusting us with your data."**[65]

79.     Pandora's Privacy Policy further provides that **"Pandora respects the privacy of visitors and recognizes the importance of protecting the information collected about them.** We have established procedures that ensure your personal data is processed in a responsible manner."[66]

80.     Pandora receives the PII of individuals from its employees and the entities and individuals that purchase its goods. In turn, Pandora entrusts this PII to its third-party vendors and service providers like Salesforce.

81.     Pandora is a Salesforce customer. Pandora stores its employees' and customers' PII on Salesforce's cloud-based software, network, and/or products.

## VI.     DEFENDANTS OBTAIN, COLLECT, USE, AND DERIVE A BENEFIT FROM THE PII OF PLAINTIFFS AND CLASS MEMBERS.

82.     Defendants obtain, collect, use, and derive a benefit from Plaintiffs' and Class Members' PII. Defendants use this PII to provide goods, making a profit therefrom. Defendants would not be able to obtain revenue if not for the acceptance and use of this PII.

83.     By collecting Plaintiffs' and the Class Members' PII, either directly or indirectly, Defendants assumed legal and equitable duties to Plaintiffs and the Class Members to protect and safeguard their PII from unauthorized access and intrusion.

---

[64] *Id.* (emphasis added).

[65] *See* https://pandoragroup.com/data-privacy-rights (emphasis added) (last visited Sept. 4, 2025) (emphasis added).

[66] *See* https://pandoragroup.com/privacy-policy (last visited Sept. 4, 2025) (emphasis added).

84.    Defendants recognize this duty in their respective Privacy Policies and marketing to their customers and employees.

85.    Defendants' assurances of maintaining high standards of cybersecurity demonstrate they recognize they have a duty to use reasonable measures to protect the PII they collect and maintain.

86.    Defendants violated their explicit privacy statements and failed to adopt reasonable and appropriate security practices and procedures, including administrative, physical security, and technical controls, to safeguard Plaintiffs' and Class Members' PII.

87.    As a result, Plaintiffs' and Class Members' PII was accessed and stolen from Defendants' inadequately secured data systems in massive and preventable Data Breaches.

## VII.    THE DATA BREACHES.

88.    Salesforce knew of the risk that vishing schemes posed to its customers, including Spoke Defendants. On March 12, 2025, Salesforce published a blog on its website for its numerous customers titled "Protect Your Salesforce Environment from Social Engineering Threats."[67] The blog identified the precise scheme employed by ShinyHunters to perpetrate the Data Breaches.

89.    Specifically, Salesforce explained, **"*Threat actors have been observed employing various social engineering tactics, including voice phishing (i.e., "vishing"), to impersonate members of an IT Support team over the phone. They have been reported luring our customers' employees and third-party support workers to phishing pages designed to steal credentials and MFA tokens or prompting users to navigate to the login.salesforce[.]com/setup/connect page in order to add a malicious connected app. In some cases, we have observed that the malicious connected app is a modified version of the Data Loader app published under a different name and/or branding.* Once the threat actor gains access to a customer's Salesforce account or adds a connected app, they use the connected app to exfiltrate data."[68]**

90.    Salesforce identified five steps customers, including Spoke Defendants, should take to fortify their networks and systems from this precise vishing attack: (1) restrict network access through IP addresses and login ranges to customers' enterprise and VPN network; (2) implement the principle of

---

[67]    *See* https://www.salesforce.com/blog/protect-against-social-engineering/ (last visited Sept. 8, 2025).
[68]    *Id.* (emphasis added).

least privilege and "Grant users only the permissions they need to do their jobs — no more, no less"; (3) enable multi-factor authentication because "*MFA adds an extra layer of defense, particularly against phishing attacks . . . .*"; (4) use the suite of security tools available in Salesforce Shield; and (5) add a security point of contact "To ensure that we can reach your organization in the case of a security event . . . ."[69]

91.     Two months later, in and around May 2025, notorious cybercriminal group ShinyHunters reportedly began a prolonged and devastating cyber-attack on Salesforce and Salesforce's customers, including Defendants. Farmers was among the first to be attacked when, on May 30, 2025, Salesforce notified it of "suspicious activity involving an unauthorized actor accessing one of [Salesforce's] databases containing Farmers customer information."[70]

92.     By June 4, 2025, GTIG outlined the common and well-known social-engineering "voice phishing" techniques ShinyHunters was using to gain unauthorized access to Defendants' systems and databases.[71] GTIG highlighted that "it's essential for [Defendants] to configure and manage access, permissions, and user training according to best practices" in order to prevent such data security incidents.[72] GTIG specifically warned that "ShinyHunters extortion group [was] conducting social engineering attacks against multi-national companies to steal data from organizations' Salesforce platforms."[73] And that "The extortion involves calls or emails to employees of the victim organization demanding payment in bitcoin within 72 hours."[74]

93.     GTIG laid out the vishing scheme being used in painstaking detail: "UNC6040 has demonstrated repeated success in breaching networks by having its operators impersonate IT support personnel in convincing telephone-based social engineering engagements. This approach has proven

---

[69] *Id.* (emphasis added).

[70] Farmers Notice of Security Incident, https://www.farmers.com/content/dam/farmers/marketing/digital/aem/pdfs/disclosures/notice-ofincident.pdf (last visited Sept. 3, 2025).

[71] *See* https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion (last visited Sept. 3, 2025).

[72] *Id.*

[73] *See* https://www.bleepingcomputer.com/news/security/google-hackers-target-salesforce-accounts-in-data-extortion-attacks/ (last visited Sept. 4, 2025).

[74] *Id.*

CLASS ACTION COMPLAINT
Case No.

1    particularly effective in tricking employees, often within English-speaking branches of multinational

2    corporations, into actions that grant the attackers access or lead to the sharing of sensitive credentials,

3    ultimately facilitating the theft of organization's Salesforce data."[75] GTIG further explained that "A

4    prevalent tactic in UNC6040's operations involves deceiving victims into authorizing a malicious

5    connected app to their organization's Salesforce portal. This application is often a modified version of

6    Salesforce's Data Loader . . . ."[76]

7         94.    GTIG connected the dots back to Salesforce's blog post explaining that "During a vishing

8    call, the actor guides the victim to visit Salesforce's connected app setup page to approve a version of the

9    Data Loader app with a name or branding that differs from the legitimate version. This step inadvertently

10   grants UNC6040 significant capabilities to access, query, and exfiltrate sensitive information directly

11   from the compromised Salesforce customer environments. *This methodology of abusing Data Loader*

12   *functionalities via malicious connected apps is consistent with recent observations detailed by Salesforce*

13   *in their guidance on protecting Salesforce environments from such threats*."[77] GTIG expressly warned

14   that ShinyHunters' attacks were targeting large companies that already used a Salesforce cloud-based

15   CRM platform—exactly the type of platform used by Defendants.[78] GTIG explained that ShinyHunters

16   "may be preparing to escalate their extortion tactics by launching a data leak site (DLS). These new

17   tactics are likely intended to increase pressure on victims . . . ."[79] GTIG warned that ShinyHunters' lateral

18   movement through Defendants' systems was not limited to Salesforce environments explaining that

19   "Upon obtaining access, UNC6040 has been observed immediately exfiltrating data from the victim's

20   Salesforce environment using Salesforce's Data Loader application. Following this initial data theft,

21   ***UNC6040 was observed leveraging end-user credentials obtained through credential harvesting or***

22   ***vishing to move laterally through victim networks, accessing and exfiltrating data from the victim's***

23   ***accounts on other cloud platforms such as Okta and Microsoft 365*."[80] GITG identified almost identical

24   

25   ────────────────

     [75] *Id.*

26   [76] *Id.*

27   [77] *Id.* (emphasis added).

     [78] *Id.*

28   [79] *Id.*

     [80] *Id.* (emphasis added).

CLASS ACTION COMPLAINT
Case No.

1  steps as those identified by Salesforce that corporations that used Salesforce should implement to mitigate
2  against this particular ShinyHunters threat.[81] Despite GTIG's and Salesforce's extensive and express
3  warnings, Spoke Defendants failed to take appropriate steps to prevent the unauthorized access.

4      95.    Nearly two months after GTIG's warnings, on July 30, 2025, Salesforce notified
5  TransUnion of an unauthorized cyber incursion that occurred two days earlier and involved Salesforce's
6  databases containing Transunion customer information.[82]

7      96.    Within a week, on or about August 5, 2025, Pandora confirmed that it had "experienced a
8  cyber security attack, where some customer information was accessed through [Salesforce] . . . ."[83]

9      97.    On August 15, 2025, Workday confirmed that it "had been targeted and threat actors were
10  able to access some information from [Salesforce]" via a "recent social engineering campaign."[84]

11     98.    Each Defendant has publicly acknowledged the Data Breaches, and notices of the Data
12  Breaches have been posted to Defendants' websites and/or provided to various State Attorneys General
13  and some of the victims.

14     99.    Defendants failed to take the necessary precautions to safeguard and protect Plaintiffs'
15  and Class Members' PII from unauthorized access and exploitation. The risk of cyberattacks, such as the
16  one that occurred here, were or should have been well-known to Defendants. Defendants could have
17  taken, but did not take, numerous simple measures to prevent the Data Breaches. Defendants' actions and
18  inactions represent a flagrant disregard of the rights of Plaintiffs and the Class Members.

19  **VIII.    RELEVANT INDUSTRY STANDARDS AND REGULATIONS FOR DATA SECURITY**

20      **A.    United States Federal Trade Commission Guidelines**

---

[81] *Id.*

[82] Transunion Data Breach Notice to Maine Attorney General,
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html?7194ef805fa2d04b0f7e8c9521f97343 (last visited Sept. 3, 2025).

[83] *See* https://www.forbes.com/sites/daveywinder/2025/08/05/pandora-confirms-cyberattackwhat-you-need-to-know/ (last visited Sept. 3, 2025).

[84] Blog, "Protecting You From Social Engineering Campaigns: An Update From Workday,"
https://blog.workday.com/en-us/protecting-you-from-social-engineering-campaigns-update-from-workday.html (last visited Sept. 3, 2025).

CLASS ACTION COMPLAINT
Case No.

100.    The United States Federal Trade Commission ("FTC") has issued numerous forms of guidance and taken enforcement actions that outline the data security industry standards applicable to Defendants.

101.    For example, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of consumer PII violates the FTC Act's prohibition against "unfair or deceptive acts."[85]

102.    In 2016, the FTC published guidance entitled *Protecting Personal Information: A Guide for Business* (the "FTC 2016 Guidance"). The FTC 2016 Guidance:

    a.  Stresses the importance of "[c]ontrol[ling] access to sensitive information" and expressly encourages businesses to "[c]onsider using multi-factor authentication, such as requiring the use of a password and a code sent by different methods."[86]

    b.  Emphasizes that companies should respond appropriately when credentials are compromised, providing that businesses should "[r]equire password changes when appropriate—for example, following a breach."

    c.  Instructs companies to restrict data access privileges by "[s]cal[ing] down access to data" and ensuring that "each employee should have access only to those resources needed to do their particular job."[87]

    d.  Warns companies that their data security practices depend on their personnel, which "includ[e] contractors" and encourages companies to "investigate [contractor] data security practices and compare their standards" and "verify compliance" with written security expectations.

    e.  Recommends that companies encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems and respond to security incidents.

    f.  Advises companies not to maintain PI longer than necessary, not to collect more PI than necessary, to use industry-tested methods for data security, and monitor and respond to suspicious activity.

---

[85] *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp.3d 374, 407 (E.D. Va. 2020) (citing *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)).

[86] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf (last visited Sept. 4, 2025).

[87] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sept. 4, 2025).

CLASS ACTION COMPLAINT
Case No.

103.    In 2021, the FTC amended its "Safeguards Rule" that applies to financial institutions, including retailers that issue their own credit cards to consumers and companies that bring together buyers and sellers of products and services.[88] The Safeguard Rule expressly requires covered businesses to "[i]mplement multi-factor authentication ["MFA"] for anyone accessing customer information on [the business's] system," to "[i]mplement and periodically review access controls [to] [d]etermine who has access to customer information and reconsider on a regular basis whether they still have a legitimate business need for it," and to "[i]mplement procedures and controls to monitor when authorized users are accessing customer information on your system and detect unauthorized access."[89]

104.    In February 2023, the FTC published an article entitled *Security Principles: Addressing underlying causes of risk in complex systems.* The article highlighted the importance of MFA, stating that it "is widely regarded as a critical security practice because it means a compromised password alone is not enough to take over someone's account."[90]

## B.    Data Breaches Are Preventable

105.    Despite the growing body of publicly available information regarding the rise of ransomware attacks, vishing schemes, and other forms of cyberattacks that compromise PII, Defendants' approach to maintaining the privacy of Plaintiffs' and Class Members' PII was inadequate, unreasonable, negligent, and reckless. Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information Defendants were maintaining and transferring for Plaintiffs and Class Members such as encrypting the information or deleting it when no longer needed, limiting employee access keys to PII, and adequately training their employees concerning vishing attacks and other social engineering schemes, which caused the exposure of Plaintiffs' and Class Members' PII.

106.    As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[91]

---

[88] 16 C.F.R. §§ 314.2(h)(2)(i), (xiii).

[89] *See* https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know (last visited Sept. 4, 2025).

[90] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/02/security-principles-addressing-underlying-causes-risk-complex-systems (last visited Sept. 4, 2025).

[91] Ransomware Prevention and Response, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Sept. 4, 2025).

CLASS ACTION COMPLAINT
Case No.

107. Defendants could have prevented these Data Breaches. They could have and should have implemented measures—as recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including, but not limited to, the following:

- **Implement an awareness and training program**. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- **Enable strong spam filters** to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- **Scan all incoming and outgoing emails** to detect threats and filter executable files from reaching end users.

- **Configure firewalls** to block access to known malicious IP addresses.

- **Patch operating systems, software, and firmware on devices**. Consider using a centralized patch management system.

- **Set anti-virus and anti-malware programs to conduct regular scans automatically**. Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage the use of privileged accounts based on the principle of least privilege**: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- **Configure access controls**—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- **Disable macro scripts from office files transmitted via email**. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- **Implement Software Restriction Policies (SRP)** or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet

CLASS ACTION COMPLAINT
Case No.

browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop protocol (RDP)** if it is not being used.

- **Use application whitelisting**, which only allows systems to execute programs known and permitted by security policy.

- **Execute operating system environments or specific programs in a virtualized environment**. Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value** and implement physical and logical separation of networks and data for different organizational units.[92]

108.    To prevent and detect cyberattacks and ransomware attacks, Defendants could and should have implemented the following preventive measures, as recommended by Microsoft's Threat Protection Intelligence Team:

- **Secure internet-facing assets**

    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audits
    - Remove privileged credentials

- **Thoroughly investigate and remediate alerts**

    - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**

    - Ensure collaboration among security operations, security admins, and information technology admins to configure servers and other endpoints securely

- **Build credential hygiene**

    - Use multifactor authentication or network level authentication and use strong, randomized, just-in-time local admin passwords

---

[92] *Id.*

- **Apply principle of least privilege**

  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications.[93]

109. Similarly, Defendants could and should have implemented measures—also recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- Know what personal information you have in your files and on your computers.
- Keep only what you need for your business.
- Protect the information that you keep.
- Properly dispose of information you no longer need. Create a plan to respond to security incidents.[94]

110. Finally, Defendants could and should have implemented the following measures—also recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions.**  Prioritize timely patching of internet-facing servers that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities....

---

[93] *See* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Sept. 4, 2025).

[94] *See* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Sept. 4, 2025).

CLASS ACTION COMPLAINT
Case No.

- **Limit the use of RDP and other remote desktop services.** If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured and security features are enabled.** For example, disable ports and protocols not being used for business purposes.[95]

111.    Because Defendants were collecting, storing, and transferring highly sensitive PII belonging to Plaintiffs and Class Members, they could—and should—have implemented all of the above measures to prevent and detect cyberattacks.

112.    The occurrence of the Data Breaches indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks or vishing attacks, resulting in the Data Breaches and data thieves accessing and acquiring the PII of Plaintiffs and millions of Class Members.

**C.     Defendants Acquire, Collect, and Store Plaintiffs' and Class Members' Private Information**

113.    Defendants acquire, collect, and store a significant amount of PII belonging to Plaintiffs and Class Members.

114.    As a condition of utilizing or purchasing Defendants' products and services and/or their employment with Defendants, Plaintiff and Class Members were required to entrust their highly sensitive PII to these entities, and in turn, either directly or indirectly, to Salesforce.

115.    By obtaining, collecting, and using Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure.

---

[95] *See* https://www.cisa.gov/resources-tools/resources/stopransomware-guide (last visited Sept. 4, 2025).

116.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted their PII to Defendants absent a commitment to safeguard that information.

117.    Upon information and belief, Defendants promised, while collecting PII from Plaintiffs and Class Members, to provide confidentiality and adequate security for their data through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

118.    Plaintiffs and Class Members relied on Defendants to keep their PII confidential and securely maintained, to use their PII for business purposes only, and to make only authorized disclosures of their PII. The Data Breaches occurred because Defendants failed to honor their commitments.

**D.    Value of Private Information**

119.    The FTC defines "identity theft" as "a fraud committed or attempted using the identifying information of another person without authority."[96] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[97]

120.    The PII of individuals remains of high value to criminals, as evidenced by the prices paid for PII on the dark web. Numerous sources cite dark-web pricing for stolen identity credentials.[98]

121.    The PII compromised in the Data Breaches is significantly more valuable than the loss of, for example, payment card information at the point of sale in a retailer data breach because, there, victims can cancel or close payment card accounts. The information compromised in these Data Breaches is impossible to "close" and difficult, if not impossible, to change—names, dates of birth, and Social Security numbers.

---

[96] 17 C.F.R. § 248.201 (2013).

[97] *Id.*

[98] *See* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Sept. 4, 2025).

CLASS ACTION COMPLAINT
Case No.

122.     Among other forms of fraud, identity thieves can obtain driver's licenses, government benefits, medical services, and housing, and even provide false information to police.

123.     The fraudulent activity resulting from the Data Breaches may not come to light for years. There may be a time lag between when the harm occurs versus when it is discovered and also between when the PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[99]

124.     When combined with other publicly available data, any PII element can be used to build full identity profiles, known as "Fullz" packages, which are frequently exploited in financial fraud schemes. "Fullz" is fraudster-speak for data that includes a victim's information, including name, address, SSN, date of birth, and more.

125.     With Fullz packages, cybercriminals can cross-reference two (or more) sources of PII to marry unregulated data available elsewhere (e.g., address or phone number) to criminally stolen data to assemble shockingly accurate and complete dossiers on individuals.

126.     Compromised PII, whether alone or as part of a Fullz package, is highly valuable to cybercriminals, who can use it to engage in a wide range of fraudulent activities, including committing unemployment insurance fraud, opening unauthorized financial accounts, and applying for government benefits.

127.     This type of identity theft renders any compromised data—including seemingly innocuous PII, such as name and contact information—valuable. In the wrong hands, up-to-date names, addresses, phone numbers, and email addresses can be used to update, validate, and verify Fullz packages, which can then be used for nefarious purposes.

---

[99] *See* https://www.gao.gov/assets/gao-07-737.pdf (last visited Sept. 4, 2025).

CLASS ACTION COMPLAINT
Case No.

128.    For example, a criminal actor can use an up-to-date Fullz package to bypass identity verification tools—which are often used in financial transactions (like loan applications), background checks, etc.—without detection. In a typical identity verification system, a user submits their PII, like their name, addresses, or date of birth. That customer-submitted PII is then cross-checked against "a trusted data set," including those from "credit bureaus, official government documents or mobile operator databases."

129.    Thus, with an up-to-date Fullz package—which might include seemingly harmless information, like the identity theft victim's name and current address—a cybercriminal has the victim's up-to-date PII, which will match the victim's information from trusted data sources, like the credit bureaus. With this information, the criminal can then successfully pass identity verification systems without raising any red flags. In this way, Fullz packages, which are made possible by up-to-date and compromised elements of PII, enable fraudsters to carry out various forms of identity theft, including taking out fraudulent loans.

130.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

**E.    Industry Standards Specific to Cloud Data Storage**

131.    In addition to the general data security standards described above, numerous authorities have issued guidance specific to cloud data storage, defining the roles and responsibilities of cloud service providers (like Salesforce) and customers (like Farmers, Workday, TransUnion, and Pandora).

**i.    Governmental Authorities**

132.    In June 2020, the FTC published an article titled, *Six steps toward more secure cloud computing.* The article warned, "As cloud computing has become business as usual for many businesses, frequent news reports about data breaches and other missteps should make companies think carefully about how they secure their data." The article expressly highlighted the importance of MFA in protecting

CLASS ACTION COMPLAINT
Case No.

consumer data stored on cloud services, recommending businesses: "Require multi-factor authentication and strong passwords to protect against the risk of unauthorized access."[100]

133.    In March 2023, the FTC issued a Request for Information seeking public comment on "Business Practices of Cloud Computing Providers that Could Impact Competition and Data Security."[101] After reviewing over 100 public comments on the issue, the FTC published a report in November 2023 titled, *Cloud Computing RFI: What we heard and learned.* The report expressly flagged the room for improvement in cloud security as follows: "[A] a number of commenters argued there is a great deal of room for improvement in cloud security; that default security configurations could be better; and that the "shared responsibility" model for cloud security often lacks clarity, which can lead to situations where neither the cloud provider nor the cloud customer implements necessary safeguards."[102]

134.    In March 2024, the U.S. National Security Agency ("NSA") and Cybersecurity & Infrastructure Agency ("CISA") issued a joint publication titled, *Use Secure Cloud Identity and Access Management Practices.* The publication warned, "[a]s organizations continue to migrate to using cloud environments, these environments are becoming increasingly valuable targets for malicious cyber actors[.]" The publication made numerous recommendations relevant to MFA, rotating credentials, and restricting allow lists to ensure only necessary privileges are granted to users:

> a.  **Multifactor authentication.** Single-factor authentication (e.g., password or PIN only) based account access is susceptible to credential theft, forgery, and reuse across multiple systems. Cloud accounts are generally globally accessible; thus they are more susceptible to certain types of single-factor authentication weaknesses. Multifactor authentication (MFA) boosts account security, better resisting compromise by enhancing user verification methods. MFA requires two or more factors for login: something the user knows, has, or is. Typically this is implemented using a password and a second factor usually based on a randomly seeded numeric token, a biometric option (such

---

[100] https://www.ftc.gov/business-guidance/blog/2020/06/six-steps-toward-more-secure-cloud-computing (last visited Sept. 4, 2025).

[101] https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-seeks-comment-business-practices-cloud-computing-providers-could-impact-competition-data (last visited Sept. 4, 2025).

[102] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/11/cloud-computing-rfi-what-we-heard-learned (last visited Sept. 4, 2025).

CLASS ACTION COMPLAINT
Case No.

as a fingerprint or facial recognition), or a physical token (unique hardware-based identifier: smartcard, Common Access Card, etc.).

b. Periodically audit IAM configurations to confirm only necessary privileges are granted to users. Many CSPs [Cloud Service Providers] offer services that will track unused privileges to help admins tailor accounts to the least privileges users need to accomplish their day-to-day responsibilities.

135.    Also in March 2024, NSA separately issued a publication titled, *NSA's Top Ten Cloud Security Mitigation Strategies*. The publication emphasized the importance of MFA, credential rotation, and restricted allow lists as follows for customers using cloud data services as follows:[103]

> Proper identity and access management (IAM) are critical to securing cloud resources. Malicious actors can compromise accounts using phishing techniques, exposed credentials, or weak authentication practices to gain initial access into cloud tenants. They can also exploit overly broad access control policies to penetrate further into the environment, gaining access to sensitive resources. To prevent this, cloud users should use secure authentication methods such as phishing-resistant multifactor authentication (MFA) and properly managed temporary credentials. Access control policies should be carefully configured to ensure users are granted the least privileges necessary. Separation of duties should be implemented to protect especially sensitive operations and resources.

### ii.    Industry Standards

136.    The PCI Data Security Council issued an April 2018 supplement to the PCI DSS, titled Cloud Computing Guidelines.[104] The PCI Cloud Computing Guidelines again emphasize the importance of MFA, providing: "PCI DSS Requirement 8.2.2 requires multi-factor authentication for all remote network access to the CDE [cardholder data environment], and when public cloud services are part of a Customer's CDE, all such access will be considered remote access and will require multi-factor authentication.

137.    The Guidelines include a section titled Intrusion Detection Systems (IDS) / Intrusion Prevention Systems (IPS), which provides: "As the Customer's access to network level data can be

---

[103] https://media.defense.gov/2024/Mar/07/2003407860/-1/-1/0/CSI-CloudTop10-Mitigation-Strategies.PDF (last visited Sept. 4, 2025).

[104] https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf (last visited Sept. 4, 2025).

severely restricted in cloud environments, the responsibility for tracking intrusions at the network layer will often reside with the Provider, as the only entity that has sufficient privileges to do this across the underlying infrastructure." The guidelines go on to note that for SaaS providers such as Salesforce: "Since customer access to low level network traffic is impossible, it must rely on Providers for IDS/IPS, monitoring and alerting."[105]

138.    The Center for Internet Security ("CIS") is a nonprofit organization that develops globally recognized best practices for securing IT systems and data. In March 2022, CIS issued a publication entitled CIS Controls Cloud Companion Guide that provided guidance on security best practices for customers using cloud services. The guidance made the following recommendations emphasizing the importance of MFA and revoking access to stale credentials:

a.    Disable Dormant Accounts. Delete or disable any dormant accounts after a period of 45 days of inactivity, where supported.

b.    Establish an Access-Revoking Process. Establish and follow a process, preferably automated, for revoking access to enterprise assets, through disabling accounts immediately upon termination, rights revocation, or role change of a user. Disabling accounts, instead of deleting accounts, may be necessary to preserve audit trails.

c.    Require MFA for Administrative Access. Require MFA for all administrative access accounts, where supported, on all enterprise assets, whether managed on-site or through a third-party provider.

139.    ISO/IEC 27017 is an international standard that "provides controls and implementation guidance for both cloud service providers and cloud service customers."[106] Control 9.2.3 specifically highlights that cloud service customers (like AMERGIS) should use MFA and cloud service providers (like Salesforce) should provide MFA capabilities as follows:

| Cloud service customer | Cloud service provider |
|---|---|
| The cloud service customer should use sufficient authentication techniques (e.g., multi-factor authentication) for authenticating | The cloud service provider should provide sufficient authentication techniques for authenticating the cloud service administrators |

---

[105] *See* https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf (last visited Sept. 4, 2025).

[106] https://www.amnafzar.net/files/1/ISO%2027000/ISO%20IEC%2027017-2015.pdf (last visited Sept. 4, 2025).

CLASS ACTION COMPLAINT
Case No.

| Cloud service customer | Cloud service provider |
|---|---|
| the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service according to the identified risks. | of the cloud service customer to the administrative capabilities of a cloud service, according to the identified risks. For example, the cloud service provider can provide multi-factor authentication capabilities or enable the use of third-party multi-factor authentication mechanisms. |

## IX.   DEFENDANTS EACH OWED A DUTY OF CARE TO PLAINTIFFS AND CLASS MEMBERS.

140.    Plaintiffs' and Class Members' PII was stored on Defendants' platforms, networks, systems or products at the time of the Data Breaches.

141.    Defendants owed common law duties to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in Defendants' possession from being compromised, accessed, stolen, or misused by unauthorized parties.

### A.    Salesforce Breached its Duty of Care to Plaintiffs and Class Members

142.    Salesforce's duty of reasonable care is established by the nature of its business, which is made possible by the "Data Cloud, which brings together all of [customers'] data into unified profiles, *while keeping it secure*."[107] In offering and undertaking these services to customers, Salesforce had a duty to exercise reasonable care to safeguard Plaintiffs' and Class Members' PII because it was foreseeable that failure to do so would cause them injury.

143.    Salesforce's duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard the PII it stored.

144.    Salesforce's duty of reasonable care is also established by its own marketing statements and Privacy Policy, which hold out its secure provision of services.

145.    Salesforce's duty of reasonable care is also established by relevant common law.

---

[107] *See* https://www.salesforce.com/blog/what-does-salesforce-do/#:~:text=Products-,Products,Partner%20Apps%20&%20Experts (last visited Sept. 4, 2025).

146.    Salesforce breached its duties to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII by failing to implement adequate data security practices, which caused the Data Breaches.

147.    Salesforce was negligent and breached its duty of care to Plaintiffs and Class Members to protect their PII from exploitation via customers' use of Salesforce's cloud-based platforms, software and databases.

148.    Salesforce's breach of its duty of care caused the Data Breaches, because had Salesforce lived up to its shared responsibility commitments to its customers, the Data Breaches could have been prevented.

149.    Salesforce's data security failings also constitute an unfair trade practice. As discussed above, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of PII violates the FTC Act's prohibition on "unfair and deceptive acts."

150.    Salesforce's breach of its duty of care and engagement in unfair trade practices caused injury to Plaintiffs and Class Members.

151.    Salesforce is liable for the injuries suffered by Plaintiffs and Class Members by virtue of its role as the proprietary owner and administrator of the cloud-based software, platforms and databases, which were used to facilitate the transfer of and store the data of its affected customers, including Farmers, Workday, TransUnion, and Pandora, as well its shared responsibility with its customers to protect PII,.

**B.    Farmers, Workday, TransUnion, and Pandora Breached their Duty of Care to Plaintiffs and Class Members**

152.    At the time of the Data Breaches, Farmers, Workday, Transunion, and Pandora failed to maintain reasonable data security measures and comply with FTC guidance and other relevant industry standards. These data security failings included the Spoke Defendants' failures to adequately select or oversee their third-party vendor, Salesforce, to which each Spoke Defendant entrusted the PII of its customers and/or employees.

153.    The Spoke Defendants' data security failings enabled the Data Breaches. Without these basic protections, cybercriminals were able to exfiltrate Plaintiffs' and Class Members' PII.

154.     The Spoke Defendants, through these data security failings, breached their express representations in their Privacy Policies, Notices and Statements, which are detailed earlier in the complaint.

155.     Alternatively, the Spoke Defendants breached implied commitments to protect the PII of customers and employees, including Plaintiffs and Class Members, by virtue of mandating that customers and employees provide their sensitive PII as a condition of using or purchasing the Spoke Defendants' products and services and/or being employed by the Spoke Defendants.

156.     The Spoke Defendants' basic data security shortcomings also constitute a breach of their duty of care to protect the PII of customers and employees, including Plaintiffs and Class Members.

**C.     Plaintiffs and Class Members have and will continue to suffer injuries because of the Data Breaches.**

157.     Plaintiffs and Class Members have and will continue to suffer the following forms of injury fairly traceable of the Data Breaches.

158.     The Data Breaches' disclosures of Plaintiffs' and Class Members' PII has created a substantial risk that their data will be misused. That cybercriminals now control that data demonstrates this risk.

159.     Plaintiffs and Class Members have and will continue to reasonably expend significant time and costs mitigating the substantial risk of data misuse. These mitigation steps include Plaintiffs and Class Members now expending time and effort to place "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

160.     Plaintiffs and Class Members have and may suffer lost property value of their PII when Defendants allowed their PII to fall into the hands of cybercriminals, who could—and likely will—freely sell or distribute it at any time.

161.     Defendants breached their express and implied contractual commitments to Plaintiffs and Class Members to protect their PII.

162.     The breach of a contractual obligation constitutes an injury to Plaintiffs and Class Members and provides a basis for a lawsuit to enforce the contractual terms.

163.    In breaching their contractual commitments, Defendants further injured Plaintiffs and Class Members by depriving them of the benefit of the bargain they had reached.

164.    For example, Plaintiffs and Class Members entered into agreements with Spoke Defendants based on express and implied representations that their PII would be protected—which they factored into the value of that exchange. By failing to maintain reasonable data security measures to protect that PII, Defendants deprived Plaintiffs and Class Members of the benefit of the bargain by which they were owed the value of reasonable data security measures that were not provided.

165.    Plaintiffs and Class Members have also may or have been injured by an invasion of their privacy rights. The disclosure of their PII to cybercriminals and potentially others if and when the cybercriminals disclose it on the dark web involves PII whose private nature was compromised by the Data Breaches.

166.    In addition, Plaintiffs and Class Members have or may suffer emotional distress and anxiety resulting from the Data Breaches and fear the substantial risk of identity theft and loss of privacy. Plaintiffs and Class Members understand that their PII cannot now be clawed back from the dark web.

## X.    PLAINTIFFS' INDIVIDUAL EXPERIENCES

### A.    Plaintiff Yadav

167.    Plaintiff Yadav is currently insured by Defendant Farmers and has been insured by Farmers for several years.

168.    Upon information and belief Mr. Yadav's PII was stolen from Defendants' systems, networks, and/or software in the Farmers Data Breach.

169.    Salesforce and Farmers possessed Mr. Yadav's PII before, during, and after the Farmers Data Breach.

170.    Because of the Farmers Data Breach, Mr. Yadav's confidential PII is in the hands of cybercriminals. As such, Mr. Yadav and other Class Members are at imminent risk of identity theft and fraud.

171.    As a result of the Farmers Data Breach, Mr. Yadav must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Farmers Data Breach, including investigating the Farmers Data Breach, investigating how best to

1  ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or

2  other information.

3      172.    Mr. Yadav places significant value on the security of his PII and does not readily disclose

4  it. Mr. Yadav has never knowingly transmitted unencrypted PII over the internet or any other unsecured

5  source.

6      173.    Mr. Yadav has been and will continue to be at a heightened and substantial risk of future

7  identity theft and its attendant damages for years to come. Such a risk is certainly real and impending,

8  and is not speculative, given the highly sensitive nature of the PII compromised by the Farmers Data

9  Breach.

10     174.    Mr. Yadav has a continuing interest in ensuring that his PII—which, upon information

11 and belief, remains in the possession of Salesforce and Farmers—is protected, and safeguarded from

12 future data breaches. Absent court intervention, Mr. Yadav's and Class Members' PII will be wholly

13 unprotected and at-risk of future data breaches.

14     175.    Mr. Yadav suffered actual injury as a result of the unauthorized access and disclosure of

15 his PII in the Farmers Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure

16 and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs

17 associated with attempting to mitigate the actual consequences of the Farmers Data Breach; (v) nominal

18 damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted

19 and available for unauthorized third parties to access and abuse; and (b) remains backed up in Salesforce's

20 and Farmers' possession and is subject to further unauthorized disclosures so long as Salesforce and

21 Farmers fail to undertake appropriate and adequate measures to protect his PII.

22     176.    The Farmers Data Breach caused Mr. Yadav to suffer fear, anxiety, and stress, which has

23 been compounded by the fact that Salesforce and Farmers have still not informed him of key details about

24 the Farmers Data Breach.

25     **B.    Plaintiff Elias**

26     177.    Mr. Elias is a former employee of Workday who worked in its Revenue Operations

27 department.

28

CLASS ACTION COMPLAINT
Case No.

178.    Upon information and belief, Mr.Elias's PII was stolen from Salesfore's and Workday's systems, networks, and/or software in the Workday Data Breach.

179.    Salesforce and Workday possessed Mr. Elias's PII before, during, and after the Workday Data Breach.

180.    Because of the Workday Data Breach, Mr. Elias's confidential PII is in the hands of cybercriminals. As such, Mr. Elias and other Class Members are at imminent risk of identity theft and fraud.

181.    As a result of the Workday Data Breach, Mr. Elias must expend hours of his time and suffered loss of productivity addressing and attempting to ameliorate, and mitigate, the future consequences of the Workday Data Breach, including investigating the Workday Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

182.    Mr. Elias places significant value on the security of his PII and does not readily disclose it. Plaintiff Elias has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

183.    Mr. Elias has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Workday Data Breach.

184.    Mr. Elias has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Salesforce and Workday, is protected, and safeguarded from future data breaches. Absent court intervention, Mr. Elias's and Class Members' PII will be wholly unprotected and at risk of future data breaches.

185.    Mr. Elias suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Workday Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Workday Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted

1  and available for unauthorized third parties to access and abuse; and (b) remains backed up in Salesforce's

2  and Workday's possession and is subject to further unauthorized disclosures so long as Salesforce and

3  Workday fail to undertake appropriate and adequate measures to protect his PII.

4       186.    The Workday Data Breach has caused Mr. Elias to suffer fear, anxiety, and stress, which

5  has been compounded by the fact that Salesforce and Workday have still not informed him of key details

6  about the Workday Data Breach.

7       **C.**    **Plaintiff Panigrahy**

8       187.    Mr. Panigrahy is a former employee of Workday where he worked as a software engineer.

9       188.    Upon information and belief, Mr. Panigrahy's PII was stolen from Salesforce's and

10  Workday's systems, networks, and/or software in the Workday Data Breach.

11       189.    Salesforce and Workday possessed Mr. Panigrahy's PII before, during, and after the

12  Workday Data Breach.

13       190.    Because of the Workday Data Breach, Mr. Panigrahy's confidential PII is in the hands of

14  cybercriminals. As such, Mr. Panigrahy and other Class Members are at imminent risk of identity theft

15  and fraud.

16       191.    As a result of the Workday Data Breach, Mr. Panigrahy must expend hours of his time

17  and suffered loss of productivity addressing and attempting to ameliorate, and mitigate, the future

18  consequences of the Workday Data Breach, including investigating the Workday Data Breach,

19  investigating how best to ensure that he is protected from identity theft, and reviewing account statements,

20  credit reports, and/or other information.

21       192.    Mr. Panigrahy places significant value on the security of his PII and does not readily

22  disclose it. Mr. Panigrahy has never knowingly transmitted unencrypted PII over the internet or any other

23  unsecured source.

24       193.    Mr. Panigrahy has been and will continue to be at a heightened and substantial risk of

25  future identity theft and its attendant damages for years to come. Such a risk is certainly real and

26  impending, and is not speculative, given the highly sensitive nature of the PII compromised by the

27  Workday Data Breach.

28

CLASS ACTION COMPLAINT
Case No.

194.    Mr. Panigrahy has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Salesforce and Workday, is protected, and safeguarded from future data breaches. Absent court intervention, Mr. Panigrahy's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

195.    Mr. Panigrahy suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Workday Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Workday Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Salesforce's and Workday's possession and is subject to further unauthorized disclosures so long as Salesforce and Workday fail to undertake appropriate and adequate measures to protect his PII.

196.    The Workday Data Breach has caused Mr. Panigrahy to suffer fear, anxiety, and stress, which has been compounded by the fact that Salesforce and Workday have still not informed him of key details about the Workday Data Breach.

**D.    Plaintiff Burg**

197.    Ms. Burg is a customer of TransUnion who has an online account with TransUnion and utilizes its credit-reporting services.

198.    Upon information and belief, Ms. Burg's PII was stolen from Salesforce's and TransUnion's systems, networks, and/or software in the TransUnion Data Breach.

199.    Salesforce and TransUnion possessed Ms. Burg's PII before, during, and after the TransUnion Data Breach.

200.    Because of the TransUnion Data Breach, Ms. Burg's confidential PII is in the hands of cybercriminals. As such, Ms. Burg and other Class Members are at imminent risk of identity theft and fraud.

201.    As a result of the TransUnion Data Breach, Ms. Burg must expend hours of her time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Transunion Data Breach, including investigating the Transunion Data Breach, investigating how

CLASS ACTION COMPLAINT
Case No.

1  best to ensure that she is protected from identity theft, and reviewing account statements, credit reports,

2  and/or other information.

3       202.    Ms. Burg places significant value on the security of her PII and does not readily disclose

4  it. Ms. Burg has never knowingly transmitted unencrypted PII over the internet or any other unsecured

5  source.

6       203.    Ms. Burg has been and will continue to be at a heightened and substantial risk of future

7  identity theft and its attendant damages for years to come. Such a risk is certainly real and impending,

8  and is not speculative, given the highly sensitive nature of the PII compromised by the Transunion Data

9  Breach. Additionally, Ms. Burg has experienced a sharp increase in targeted phishing emails that

10 incorporate information she provided to TransUnion.

11      204.    Ms. Burg has a continuing interest in ensuring that her PII, which, upon information and

12 belief, remains in the possession of Salesforce and TransUnion, is protected and safeguarded from future

13 data breaches. Absent court intervention, Ms. Burg's and Class Members' PII will be wholly unprotected

14 and at-risk of future data breaches.

15      205.    Ms. Burg suffered actual injury as a result of the unauthorized access and disclosure of

16 her PII in the Transunion Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure

17 and/or theft of her PII; (iii) lost or diminished value of her PII; (iv) lost time and opportunity costs

18 associated with attempting to mitigate the actual consequences of the Transunion Data Breach; (v)

19 nominal damages; and (vi) the continued and certainly increased risk to her PII, which: (a) remains

20 unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up

21 in Salesforce's and Transunion's possession and is subject to further unauthorized disclosures so long

22 Salesforce and Transunion fail to undertake appropriate and adequate measures to protect her PII.

23      206.    The TransUnion Data Breach has caused Ms. Burg to suffer fear, anxiety, and stress,

24 which has been compounded by the fact that Salesforce and Transunion have still not informed her of

25 key details about the TransUnion Data Breach.

26      **E.    Plaintiff Zurawskyj**

27      207.    Mr. Zurawskyj is a customer of TransUnion who has an online account with TransUnion

28 and utilizes its credit-reporting services.

208.    Upon information and belief, Mr. Zurawskyj's PII was stolen from Salesforce's and TransUnion's systems, networks, and/or software in the TransUnion Data Breach. On August 26, 2025, TransUnion sent a "Notice of Data Incident" to Mr. Zurawskyj wherein it stated that there was "a cyber incident involving unauthorized access to some of your personal data that was stored on a third-party application" and "we recently experienced a cyber incident involving a third-party application serving our U.S. customer support operations." The Notice confirmed that the information "included your SSN and DOB."

209.    Salesforce and TransUnion possessed Mr. Zurawskyj's PII before, during, and after the TransUnion Data Breach.

210.    Because of the TransUnion Data Breach, Mr. Zurawskyj's confidential PII is in the hands of cybercriminals. As such, Mr. Zurawskyj and other Class Members are at imminent risk of identity theft and fraud.

211.    As a result of the TransUnion Data Breach, Mr. Zurawskyj must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Transunion Data Breach, including investigating the Transunion Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

212.    Mr. Zurawskyj places significant value on the security of his PII and does not readily disclose it. Mr. Zurawskyj has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

213.    Mr. Zurawskyj has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Transunion Data Breach. Additionally, Mr. Zurawskyj has experienced a sharp increase in targeted phishing emails that incorporate information he provided to TransUnion. Further, Mr. Zurawskyj's credit card provider, Capital One, recently notified him that there had been fraudulent attempts on his account and, upon information belief, that is the reason they shipped him a new credit card recently.

214.     Mr. Zurawskyj has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Salesforce and TransUnion, is protected and safeguarded from future data breaches. Absent court intervention, Mr. Zurawskyj's and Class Members' PII will be wholly unprotected and at-risk of future data breaches.

215.     Mr. Zurawskyj suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Transunion Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Transunion Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Salesforce's and Transunion's possession and is subject to further unauthorized disclosures so long Salesforce and Transunion fail to undertake appropriate and adequate measures to protect his PII.

216.     The TransUnion Data Breach has caused Mr. Zurawskyj to suffer fear, anxiety, and stress, which has been compounded by the fact that Salesforce and Transunion have still not informed him of key details about the TransUnion Data Breach beyond the vague and incomplete "Notice" described above.

### F.     Plaintiff Grogg

217.     Ms. Grogg is a customer of Pandora who has purchased goods from Pandora's brick-and-mortar retail stores and online.

218.     Upon information and belief, Ms. Grogg's PII was stolen from Salesforce's and Pandora's systems, networks, and/or software in the Pandora Data Breach.

219.     Salesforce and Pandora were in possession of Ms. Grogg's PII before, during, and after the Pandora Data Breach.

220.     Because of the Pandora Data Breach, Ms.Grogg's confidential PII is in the hands of cybercriminals. As such, Ms. Grogg and other Class Members are at imminent risk of identity theft and fraud.

221.     As a result of the Pandora Data Breach, Ms. Gross must expend hours of her time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences

of the Pandora Data Breach, including investigating the Pandora Data Breach, investigating how best to ensure that she is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

222.    Ms. Grogg places significant value on the security of her PII and does not readily disclose it. Ms. Grogg has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

223.    Ms. Grogg has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Pandora Data Breach. In or around August 2025, Ms. Grogg's bank notified her of a fraudulent charge to her USAA credit card. As a result, the card was deactivated and Ms. Grogg was charged late fees for automatic payments associated with the card that were eventually waived. Ms. Grogg has also experienced a marked increase in targeted spam and phishing emails and text messages.

224.    Ms. Grogg has a continuing interest in ensuring that her PII, which, upon information and belief, remains in the possession of Salesforce and Pandora, is protected and safeguarded from future data breaches. Absent court intervention, Ms. Grogg's and Class Members' PII will be wholly unprotected and at risk of future data breaches.

225.    Ms. Grogg suffered actual injury as a result of the unauthorized access and disclosure of her PII in the Pandora Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her PII; (iii) lost or diminished value of her PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pandora Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Salesforce's and Pandora's possession and is subject to further unauthorized disclosures so long as Salesforce and Pandora fail to undertake appropriate and adequate measures to protect her PII.

226.    The Pandora Data Breach has caused Ms. Grogg to suffer fear, anxiety, and stress, which has been compounded by the fact that Salesforce and Pandora have still not informed her of key details about the Pandora Data Breach.

1

## XI.    CLASS ACTION ALLEGATIONS

2

227.    Plaintiffs bring this action on their own behalf and on behalf of the following "Salesforce

3

Class":

4

>    **Salesforce Class.** All individuals residing in the United States whose PII
>    was compromised in the Data Breaches.

5

6

228.    Plaintiffs' proposed class definition against Salesforce includes proposed national and/or

7

state class definitions against Defendants Farmers, Workday, TransUnion, and Pandora. For example,

8

the Salesforce Class includes the Classes proposed for Defendants Farmers, Workday, TransUnion, and

9

Pandora.

10

229.    Plaintiff Yadav also brings this action on his own behalf and on behalf of the following

11

"Farmers Class":

12

>    **Farmers Class.** All current and former Farmers customers and employees
>    residing in the United States whose data was accessed or stolen in the
>    Farmers Data Breach.

13

14

230.    Plaintiff Elias also brings this action on his own behalf and on behalf of the following

15

"Workday Class":

16

>    **Workday Class.** All current and former Workday customers and
>    employees residing in the United States whose data was accessed or stolen
>    in the Workday Data Breach.

17

18

19

231.    Plaintiffs Burg and Zurawskyj brings this action on their own behalf and on behalf of the

20

following "TransUnion Class":

21

>    **TransUnion Class.** All current and former TransUnion customers and employees
>    residing in the United States whose data was accessed or stolen in the Transunion
>    Data Breach.

22

232.    Plaintiff Grogg also brings this action on her own behalf, and on behalf of the following

23

"Pandora Class":

24

>    **Pandora Class.** All current and former Pandora customers and employees
>    residing in the United States whose data was accessed or stolen in the
>    Pandora Data Breach.

25

26

27

233.    Excluded from each of the Classes are Defendants' officers, directors, and any entity in

28

which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys,

45

successors, heirs, and assigns of Defendants. Excluded also from each of the Classes are members of the judiciary to whom this case is assigned, their families and members of their staff.

234. Plaintiffs reserve the right to amend or modify the definition of the Classes or create additional subclasses as this case progresses.

235. **Numerosity.** The members of the Classes are so numerous that joinder of all Class Members is impracticable. Public reporting presently indicates that there are dozens of impacted companies, with millions of customers and employees, whose data was implicated in the Data Breaches.

236. **Commonality.** There are questions of fact and law common to each of the Classes, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

a. Whether Defendants had a duty to protect the PII of Plaintiffs and Class Members and whether they breached that duty.

b. Whether Defendants knew or should have known that their data security practices were deficient.

c. Whether Defendants' data security systems were consistent with industry standards before the Data Breaches.

d. Whether Plaintiffs and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, nominal damages, and/or injunctive relief.

237. **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Members', was compromised in the Data Breaches.

238. **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' Counsel are competent and experienced in litigating class actions, including data-breach class actions specifically.

239. **Predominance.** Defendants engaged in a common course of conduct toward Plaintiffs and Class Members, whose data was stored on the same Salesforce software and products and was unlawfully accessed in the same manner. The common issues arising from Defendants' conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

240.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Classes. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find the cost of litigating their individual claims to be prohibitively high and therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications as to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects each Class Member's rights.

241.    Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by individual member of the Classes would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

- The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

- Defendants have acted or refused to act on grounds generally applicable to the Classes, making injunctive and corresponding declarative relief appropriate with respect to the classes as a whole; and

- The claims of Class members are comprise of common issues whose resolution in a class trial would materially advance this litigation.

242.    Finally, all members of the proposed Classes are readily ascertainable. Defendants have access to the names and contact information of all Class Members affected by the Data Breaches.

## XII.    CAUSES OF ACTION

### A.    Count I: Negligence

**(On behalf of the Plaintiffs and Class Members against all Defendants)**

243.    Plaintiffs repeat and re-allege the factual allegations above as if fully set forth herein.

244.    Defendants owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their PII in its possession from being compromised, stolen, or misused by unauthorized persons.

245.    Plaintiffs and Class Members entrusted Defendants with their PII with the understanding that Defendants would safeguard their PII.

246.    Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if their PII were wrongfully disclosed.

247.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Plaintiffs and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft.

248.    Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the PII of Plaintiffs and Class Members; (b) maintaining, testing, and monitoring Defendants' security systems to ensure that PII was adequately secured and protected; (c) implementing intrusion detection systems and timely notifying customers of suspicious intrusions; (d) ensuring any third-party software products to which they entrusted Plaintiffs' and Class Members' PII were adequately and reasonably secure and not vulnerable to exploitation; and (e) adequately notifying Plaintiffs and Class Members about the types of data that were compromised in the Data Breaches.

249.    Defendants' duties to use reasonable care arose from several sources, including those set out below.

250.    Defendants had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

251.    Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Defendants stored valuable PII that is routinely targeted by cybercriminals. Plaintiffs and Class Members were the foreseeable and probable victims of any breach resulting from Defendants' inadequate data security practices.

252.    Defendants further assumed a duty of reasonable care in making representations in marketing materials and their respective Privacy Policies, Notices and Statements concerning data security.

253.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

254.    Defendants had and continue to have a duty to adequately disclose that the PII of Plaintiffs and Class Members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

255.    Defendants breached their duty owed to Plaintiffs and Class Members by failing to maintain adequate data security practices that conformed with industry standards and were therefore negligent. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

      a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' PII;

      b.    Failing to adequately monitor the security of their networks and systems;

      c.    Failure to adequately train their employees to maintain reasonable data security safeguards;

      d.    Allowing unauthorized access to Plaintiffs' and Class Members' PII;

      e.    Failing to detect in a timely manner that Plaintiffs' and Class Members' PII had been compromised;

      f.    Failing to remove Plaintiffs' and Class Members' PII they were no longer required to retain pursuant to regulations;

      g.    Failing to timely and adequately notify Plaintiffs and Class Members about the Data Breaches' occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

h.     Failing to ensure any third party vendor or software they used were adequately and reasonably secure to protect the PII Plaintiffs and Class Members entrusted to Defendants.

256.    But for Defendants' negligence, the PII of Plaintiffs and Class Members would not have been stolen by cybercriminals in the Data Breaches.

257.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

258.    Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

259.    The harm that occurred because of the Data Breaches is the type of harm the FTC Act was intended to guard against.

260.    Defendants' violation of Section 5 of the FTC Act constitutes negligence.

261.    The FTC has pursued enforcement actions against businesses, which, because they failed to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

262.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly considering Defendants' inadequate security practices.

263.    Plaintiffs and Class Members were the foreseeable and probable victims of any consequences of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and Class Members, the critical importance of adequately safeguarding that PII, and the necessity of encrypting PII stored on their systems.

264.    It was therefore foreseeable that failing to adequately safeguard Plaintiffs' and Class Members' PII would result in one or more types of injuries to Class Members.

265.    There is a close causal connection between Defendants' failure to implement security measures to protect Plaintiffs' and Class Members' PII and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The PII of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

266.    As a direct and proximate result of Defendants' breach of their duties, Plaintiffs and Class Members have suffered injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breaches; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breaches; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: remains (a) unencrypted and available for unauthorized third parties to access and abuse; and (b) backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their PII.

267.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

268.    Plaintiffs and Class Members had no ability to protect their PII that was in, and remains in, Defendants' possession.

269.    Defendants were in a position to protect against the harm suffered by Plaintiffs and Class Members because of the Data Breaches.

270.    Defendants' duty extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized a specific duty to reasonably safeguard PII.

CLASS ACTION COMPLAINT
Case No.

271.    Defendants have admitted that the PII of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons because of the Data Breaches.

272.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**B.     Count II: Breach of Implied Contract**

**(On behalf of Plaintiffs and the Subclass Members against Defendants Farmers, Workday, TransUnion and Pandora)**

273.    Plaintiffs repeat and re-allege the factual allegations above as if fully set forth herein.

274.    As a condition of using or purchasing Farmers', Workday's, TransUnion's, and Pandora's products and services and/or employment with Farmers, Workday, TransUnion, and Pandora, they required Plaintiffs and Class Members to provide them with their PII.

275.    In mandating that Plaintiffs and Class Members provide their PII, Farmers, Workday, TransUnion, and Pandora implied an assent to safeguard and protect their PII. In so doing, Plaintiffs and Class Members entered into implied contracts with Farmers, Workday, TransUnion, and Pandora by which they agreed to safeguard and protect their PII, to keep it secure and confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been breached and compromised or stolen.

276.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Farmers, Workday, TransUnion, and Pandora's data security practices complied with relevant laws and regulations and were consistent with industry standards.

277.    Implicit in the agreement between Plaintiffs and Class Members, on the one hand, and Farmers, Workday, TransUnion, and Pandora, on the other, was that in providing PII, Farmers, Workday, TransUnion, and Pandora were obligated to: (a) use such PII for business purposes only; (b) take reasonable steps to safeguard that PII; (c) prevent unauthorized disclosures of the PII; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from

1    unauthorized disclosure or uses; and (f) retain the PII only under conditions that kept it secure and

2    confidential.

3        278.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand,

4    and Farmers, Workday, TransUnion, and Pandora, on the other, is demonstrated by their conduct and

5    course of dealing.

6        279.    Farmers, Workday, TransUnion, and Pandora solicited, offered, and invited Plaintiffs and

7    Class Members to provide their PII as part of Farmers, Workday, TransUnion, and Pandora's regular

8    business practices. Plaintiffs and Class Members accepted Farmers, Workday, TransUnion, and

9    Pandora's offers and provided their PII to them.

10       280.    In accepting the PII of Plaintiffs and Class Members, Farmers, Workday, TransUnion, and

11   Pandora understood and agreed that they were required to reasonably safeguard the PII from unauthorized

12   access or disclosure.

13       281.    Plaintiffs and Class Members would not have provided their PII to Farmers, Workday,

14   TransUnion, and Pandora had they known that they would not safeguard their PII as promised.

15       282.    Plaintiffs and Class Members fully performed their obligations under their implied

16   contracts with Farmers, Workday, TransUnion, and Pandora.

17       283.    Farmers, Workday, TransUnion, and Pandora breached their implied contracts with

18   Plaintiffs and Class Members by failing to safeguard their PII.

19       284.    At all relevant times, Farmers, Workday, TransUnion, and Pandora promulgated, adopted,

20   and implemented written privacy policies whereby they expressly promised Plaintiffs and Class Members

21   that they would disclose PII only under certain circumstances, none of which relate to the Data Breaches.

22       285.    Farmers, Workday, TransUnion, and Pandora further promised to comply with industry

23   standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

24       286.    As a direct and proximate result of Farmers, Workday, TransUnion, and Pandora's

25   breaches of implied contract, Plaintiffs and Class Members have suffered injuries in fact including (i)

26   invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and

27   opportunity costs associated with attempting to mitigate the actual consequences of the Data Breaches;

28   (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data

CLASS ACTION COMPLAINT
Case No.

Breaches; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Farmers, Workday, TransUnion, and Pandora's possession and is subject to further unauthorized disclosures so long as they fail to undertake appropriate and adequate measures to protect their PII.

287. As a direct and proximate result of Farmers, Workday, TransUnion, and Pandora breaches of implied contract, Plaintiffs and Class Members are entitled to damages, including compensatory damages, punitive damages, and/or nominal damages, in an amount to be proven at trial.

C. **Count III: Unjust Enrichment**

**(On behalf of Plaintiffs and Class Members against all Defendants)**

288. Plaintiffs repeat and re-allege the factual allegations above as if fully set forth herein.

289. Plaintiffs bring this Count in the alternative to Count II above with respect to Farmers, Workday, TransUnion, and Pandora.

290. Upon information and belief, Defendants fund any data security measures they implement entirely from their general revenues, including from money they make (including that supplied by contractual payments directly or indirectly by Plaintiffs and Class Members) based upon representations of protecting PII.

291. Thus, there is a direct nexus between money paid to Defendants and the requirement that Defendants keep PII confidential and protected.

292. Plaintiffs and Class Members paid Defendants, directly or indirectly, a certain sum of money, which was used to fund any data security measures implemented by Defendants.

293. As such, a portion of the payments made by Plaintiffs and Class Members (or made on their behalf) is to be allocated to and used to provide a reasonable and adequate level of data security, the amount of which is known to Defendants.

294. Protecting PII is integral to Defendants' businesses. Without PII, Defendants would be unable to provide the business services which comprise Defendants' core businesses.

295.    Plaintiffs' and Class Members' PII has monetary value. Thus, Plaintiffs and Class Members conferred a monetary benefit on Defendants.

296.    Defendants collected and stored the PII provided by Plaintiffs and Class Members to Defendants. In exchange, Plaintiffs and Class Members should have received from Defendants the services that comprise Defendants' businesses and should have had the PII protected with adequate data security.

297.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendants profited from the PII and used the PII for business purposes.

298.    Defendants failed to secure the PII and, therefore, did not fully compensate Plaintiffs and Class Members for the value that the PII provided.

299.    Had Plaintiffs and Class Members known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure the PII, they would not have entrusted the PII to Defendants or obtained services from Defendants.

300.    Plaintiffs and Class Members have no adequate remedy at law.

301.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure the PII. Instead of providing a reasonable level of security that would have prevented the Data Breaches, Defendants instead calculated to increase their own profit at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decisions to prioritize their own profits over the requisite data security and the safety of Plaintiffs' and Class Members' PII.

302.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

303.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breaches; (v) lost opportunity costs associated

with attempting to mitigate the actual consequences of the Data Breaches; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their PII.

304.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

305.    Because Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, they plead this claim for unjust enrichment in addition to or in the alternative to other claims pleaded herein.

**D.    Count IV: Violations of California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.* ("CCPA")**

**(On behalf of Plaintiff Panigrahy and Class Members residing in California against Defendants Salesforce and Workday)**

306.    Plaintiff Panigrahy repeats and re-alleges the factual allegations above as if fully set forth herein.

307.    California Plaintiff Panigrahy brings this Count on his own behalf and on behalf of Salesforce and Workday Class Members residing in California.

308.    The California Legislature has explained: "The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."[108]

---

[108] *See* California Consumer Privacy Act (CCPA) Compliance, https://buyergenomics.com/ccpa-complience/ (last visited May 13, 2025).

CLASS ACTION COMPLAINT
Case No.

309.    The CCPA imposes an affirmative duty on businesses that maintain PII about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendants failed to implement such procedures which resulted in the Data Breaches.

310.    The CCPA also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(c).

311.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

312.    Plaintiffs and Class Members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

313.    Defendants Salesforce and Workday are bothe "businesses" as defined by Civ. Code § 1798.140(c) because Defendants:

    a.    are a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

    b.    "collect[] consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determine[] the purposes and means of the processing of consumers' personal information";

    c.    do business in California; and

d.    have annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

314.    The PII taken in the Data Breach is "personal information" as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiffs' and Class Members' unencrypted names, contact information, dates of birth, and Social Security numbers and Driver's License numbers.

315.    Plaintiffs' and Class Members' unencrypted and unredacted PII was subject to unauthorized access and exfiltration, theft, or disclosure because their PII, including names, contact information, dates of birth, Social Security numbers, and Driver's License numbers were wrongfully taken, accessed, and viewed by unauthorized third parties.

316.    The Data Breaches occurred because of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiff Panigrahy's and Class Members' PII. Defendants failed to implement reasonable security procedures to prevent an attack on their server or network, including Salesforce's cloud-based databases, by hackers and to prevent unauthorized access of Plaintiffs' and Class Members' PII as a result of these attacks.

317.    On September 15, 2025, Plaintiff Panigrahy provided Defendants with written notice of Defendants' violations of the CCPA, pursuant to Civil Code § 1798.150(b)(1). If Defendants are unable to cure or do not cure the violation within 30 days, Plaintiff will amend this complaint to pursue actual or statutory damages, as permitted by Civil Code Section 1798.150(a).

318.    Plaintiff presently seeks injunctive and declaratory relief, and any othe relief as deemed appropriate by the Court for Defendants' CCPA violations.

**E.    Count V: Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.-Unfair Business Practices***

**(On behalf of Plaintiff Panigrahy and Class Members residing in California against Defendants Salesforce and Workday)**

319.    Plaintiff Panigrahy repeats and re-alleges the factual allegations above as if fully set forth herein.

320.    California Plaintiff Panigrahy brings this Count on his own behalf and on behalf of Salesforce and Workday Class Members residing in California.

321.    Defendants violated Cal. Bus. & Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices, that constitute acts of "unfair competition" as defined in Cal. Bus. & Prof. Code § 17200.

322.    Defendants engaged in unlawful and unfair acts and practices by establishing the sub–standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class Members' PII with knowledge the information would not be adequately protected; and by storing Plaintiffs' and Class Members' PII in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code §1798.81.5, which requires Defendants to take reasonable methods of safeguarding the PII of Plaintiff and Class Members.

323.    In addition, Defendants engaged in unlawful acts and practices by failing to disclose the Data Breaches in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.

324.    Defendants' practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities that solicitor are entrusted with personal data utilize appropriate security measures, as reflected by laws like the FTC Act, 15 U.S.C. § 45.

325.    As a direct and proximate result of Defendants' unlawful and unfair practices and acts, Plaintiff Panigrahy and Class Members residing in California were injured and lost money or property, including but not limited to the loss of Plaintiff's and Class Members' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described herein.

326.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Plaintiff's and Class Members' PII and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unlawful practices

1    and acts were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of

2    Plaintiffs and Class Members.

3        327.    Plaintiff and Class members have no adequate remedy at law.

4        328.    Plaintiff Panigrahy, on behalf of Class Members residing in California, seeks relief under

5    Cal. Bus. & Prof. Code § 17200, et seq., including but not limited to restitution to Plaintiff Panigrahy and

6    Class Members residing in California of money or property Defendants may have acquired by means of

7    their unlawful, and unfair business practices, restitutionary disgorgement of all monies that accrued to

8    Defendants because of Defendants' unlawful and unfair business practices, declaratory relief, attorneys'

9    fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

10    **F.    Count VI: Violations of Illinois Consumer Fraud and Deceptive Business Practices**

11    **Act ("CFA"), 815 Ill. Comp. Stat. §§ 505/1, *et seq.***

12    **(On behalf of Plaintiff Burg and Class Members residing in Illinois against all**

13    **Defendants)**

14        329.    Plaintiff Burg repeats and re-alleges the factual allegations above as if fully set forth

15    herein.

16        330.    Ms. Burg brings this Count on her own behalf and on behalf of Class Members residing

17    in Illinois.

18        331.    Ms. Burg and Class Members residing in Illinois are "consumers" as defined in 815 Ill.

19    Comp. Stat. § 505/1(e). Plaintiff Burg, Class Members residing in Illinois, and Defendants are "persons"

20    as defined in 815 Ill. Comp. Stat. § 505/1(c).

21        332.    Defendants engaged in "trade" or "commerce," including the provision of services, as

22    defined under 815 Ill. Comp. Stat. § 505/1(f). Pursuant to Defendants' "trade" or "commerce," they

23    disclosed Ms. Burg's and Class Members residing in Illinois PII to Defendant Salesforce. Moreover,

24    Defendants engage in the sale of "merchandise" as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

25        333.    Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the

26    concealment and omission of material facts in connection with the sale and advertisement of their services

27    in violation of the CFA, including: (i) failing to maintain and/or ensure that adequate data security was

28    used—including by Salesforce—as to keep Plaintiff Burg's and Class Members residing in Illinois

sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (ii) failing to disclose or omitting materials facts to Plaintiff Burg and Class Members residing in Illinois the lack of adequate data security and inability or unwillingness to properly secure and protect the PII of Plaintiff Burg and the Illinois Subclass; (iii) failing to disclose or omitting materials facts to Plaintiff and Class Members residing in Illinois about Defendants' failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of Plaintiffs and Class Members residing in Illinois; and (iv) failing to take proper action following the Data Breaches to enact adequate privacy and security measures and protect Plaintiff Burg's and Class Members residing in Illinois PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

334.    These actions also constitute deceptive and unfair acts or practices because Defendants knew the facts about the inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiff Burg and Class Members residing in Illinois and defeat their reasonable expectations about the security of their PII.

335.    Defendants intended that Plaintiff Burg and Class Members residing in Illinois rely on their deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendants' offering of goods and services.

336.    Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to Class Members residing in Illinois. Plaintiff Burg and Class Members residing in Illinois have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

337.    As a result of Defendants' wrongful conduct, Plaintiff and Class Members residing in Illinois were injured in that they never would have provided their PII to Defendants, or used Defendants' services, had they known or been told that Defendants failed to maintain and/or ensure sufficient security as to keep their PII from being hacked and taken and misused by others.

338.    As a direct and proximate result of Defendants' violations of the CFA, Plaintiff Burg and Class Members residing in Illinois have suffered harm: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-

1  pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or

2  unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of

3  productivity addressing and attempting to mitigate the actual and future consequences of the Data

4  Breaches, including but not limited to efforts spent researching how to prevent, detect, contest, and

5  recover from identity theft; (vi) the continued risk to their PII, which remain in Defendants' possession

6  and/or control and is subject to further unauthorized disclosures so long as Defendants fail to undertake

7  appropriate and adequate measures to protect PII in their continued possession and/or control; and (vii)

8  future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and

9  repair the impact of the PII compromised as a result of the Data Breaches for the remainder of the lives

10  of Plaintiff Burg and Class Members residing in Illinois.

11       339.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff Burg and Class Members residing

12  in Illinois seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees

13  because of Defendants' violations of the CFA.

14                                   **PRAYER FOR RELIEF**

15       **WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment

16  against Defendants and that the Court grant the following:

17       A.    An Order certifying the Class and appointing Plaintiffs and their Counsel to represent the

18            Class;

19       B.    Equitable relief enjoining Defendants from engaging in the wrongful conduct complained

20            of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class

21            Members;

22       C.    Injunctive relief, including but not limited to injunctive and other equitable relief as is

23            necessary to protect the interests of Plaintiffs and Class Members, including but not

24            limited to an order:

25            i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described

26                  herein;

27            ii.   requiring Defendants to protect, including through encryption, all data collected

28                  through the course of their business in accordance with all applicable regulations,

CLASS ACTION COMPLAINT
Case No.

1    industry standards, and federal, state or local laws;

2    iii.    requiring Defendants to delete, destroy, and purge the PII of Plaintiffs and Class

3            Members unless Defendants can provide the Court with reasonable justification for

4            the retention and use of such information when weighed against the privacy interests

5            of Plaintiffs and Class Members;

6    iv.    requiring Defendants to pay out-of-pocket expenses associated with the prevention,

7            detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII

8            for Plaintiffs' and Class Members' lifetimes;

9    v.    requiring Defendants to implement and maintain a comprehensive Information

10           Security Program designed to protect the confidentiality and integrity of Plaintiffs'

11           and Class Members' PII;

12   vi.    requiring Defendants to engage independent third-party security auditors and/or

13           penetration testers as well as internal security personnel to conduct testing, including

14           simulated attacks, penetration tests, and audits on Defendants' systems on a periodic

15           basis and ordering Defendants to promptly correct any problems or issues detected by

16           such third-party security auditors;

17   vii.    requiring Defendants to engage independent third-party security auditors and internal

18           personnel to run automated security monitoring;

19   viii.    requiring Defendants to audit, test, and train their security personnel regarding any

20           new or modified procedures;

21   ix.    requiring Defendants to segment data by, among other things, creating firewalls and

22           controls so that if one area of Defendants' networks is compromised, hackers cannot

23           gain access to other portions of Defendants' systems;

24   x.    requiring Defendants to conduct regular database scanning and securing checks;

25   xi.    requiring Defendants to establish an information security training program that

26           includes at least annual information security training for all employees, with additional

27           training to be provided as appropriate based upon the employees' respective

28           responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class

Members;

xii.   requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and how to respond to a breach;

xiii.   requiring Defendants to implement testing systems to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, and randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting PII;

xiv.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat-management program designed to appropriately monitor Defendants' information networks for internal and external threats and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendants to meaningfully educate all Class Members about the threats that they face because of the loss of their confidential PII to unauthorized third parties as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xvii.   for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of damages, including actual, statutory, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

CLASS ACTION COMPLAINT
Case No.

1    Plaintiffs hereby demand a trial by jury on all claims so triable.

2

3    Dated: September 15, 2025                    Respectfully submitted,

4                                                By: /s/ Dena C. Sharp
                                                Dena C. Sharp (State Bar No. 245869)
5                                                Adam E. Polk (State Bar No. 273000)
                                                **GIRARD SHARP LLP**
6                                                601 California Street, Suite 1400
                                                San Francisco, California 94108
7                                                Telephone: (415) 981-4800
                                                Facsimile: (415) 981-4846
8                                                Email: dsharp@girardsharp.com
9                                                Email: apolk@girardsharp.com

10
                                                Christopher L. Lebsock (State Bar No. 184546)
11                                                **HAUSFELD LLP**
                                                580 California Street, 12th Floor
12                                                San Francisco, CA 94104
                                                (415) 633-1908
13                                                Email: clebsock@hausfeld.com
14

15                                                James J. Pizzirusso (*pro hac vice* forthcoming)
                                                Nicholas U. Murphy (*pro hac vice* forthcoming)
16                                                **HAUSFELD LLP**
                                                1201 17th Street, NW, Suite 600
17                                                Washington, DC 20036
                                                202-540-7200
18                                                Email: jpizirusso@hausfeld.com
19                                                Email: nmurphy@hausfeld.com

20                                                Steven M. Nathan (State Bar No. 153250)
21                                                Gisela Rosa (*pro hac vice* forthcoming)
                                                **HAUSFELD LLP**
22                                                33 Whitehall Street
                                                Fourteenth Floor
23                                                New York, NY 10004
                                                (646) 357-1100
24                                                Email: snathan@hausfeld.com
25                                                Email: zrosa@hausfeld.com

26                                                Jason L. Lichtman (*pro hac vice* forthcoming)
27                                                Sean A. Petterson (*pro hac vice* forthcoming)
                                                **LIEFF CABRASER HEIMANN &**
28                                                **BERNSTEIN LLP**
                                                250 Hudson Street, 8th Floor

---

65

CLASS ACTION COMPLAINT
Case No.

New York, New York 10013
Telephone: (212) 355-9500
Email: jlichtman@lchb.com
Email: spetterson@lchb.com

*Counsel for Plaintiffs*

CLASS ACTION COMPLAINT
Case No.